UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TONY L. EVANS, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:05-0368 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| PROSPECT AIRPORT ) | |
| SERVICES, INC. ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This matter comes before the court on a Motion for Summary Judgment filed by the defendant (Docket No. 32), to which the plaintiff has responded (Docket No. 37), and the defendant has replied (Docket No. 40). In addition, the court will consider a Motion to Strike filed by the plaintiff (Docket No. 44), to which the defendant has responded (Docket No. 46). For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted, and the plaintiff's Motion to Strike will be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Tony Evans was employed by defendant Prospect Airport Services as a passenger service assistant from August 2001 through November 9, 2005.[1] As a passenger service assistant, it was Mr. Evans' duty to assist passengers at Nashville International Airport

---

[1] Unless otherwise noted, the facts have been drawn from the plaintiff's Amended Complaint (Docket No. 16), the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 39), the plaintiff's Additional Statement of Material Facts (Docket No. 38), and the plaintiff's Response in Opposition to Motion for Summary Judgment (Docket No. 37).

1

into wheelchairs and to push them in the wheelchairs to and from the terminals.

Mr. Evans alleges that, during his employment, he was subject to racial discrimination in the form of harassment by his manager, Robert Strobel.  Mr. Evans alleges that Mr. Strobel told another employee, Eddie Clemons, that he was planning to tar his roof with a substance that was "black like a nigger."  Mr. Strobel has countered that, in fact, he said that he was planning to tar his roof with a substance called "black mammy," which, he alleges, is a particular type of roofing tar.  Mr. Evans alleges that another employee, Jennifer Clark, told him that Mr. Strobel had used the word "nigger" in reference to her infant.  Mr. Evans alleges that Mr. Strobel asked him whether any white people had attended his wedding.  Mr. Evans alleges that, at some point, Mr. Evans told another employee that he was not going to hire "any more blacks," but the plaintiff does not know exactly when this statement occurred.  Additionally, roughly five months after Mr. Evans is alleged to have made the statement, he did hire an African-American employee.  (Docket No. 42 at p. 5)  In the winter, Mr. Evans alleges that Mr. Strobel handed out jackets to white employees without their asking for them but only gave black employees the jackets if they specifically asked for them.  In addition, Mr. Evans makes general allegations that Mr. Strobel and other supervisors treated white workers better than black workers.

In 2004, Mr. Evans received two written warnings from Mr. Strobel for being out of uniform.  In addition, the defendant has produced an unsigned written warning from 2002 advising the plaintiff that he was not allowed to clock in early for his shifts, though Mr. Evans does not recall having received that warning.  On May 25, 2004, Mr. Evans filed his first EEOC charge.  The charge claimed that, because of his race, Mr. Evans had not been paid for hours he had worked, and that, as an African-American, he had been required to pay for his uniform while

others were not.  Following the charge, the defendant performed a complete audit of the plaintiff's time records from August 2001 to July 2004 and determined that it owed him $179.25.  The defendant tendered Mr. Evans a check for that amount in September 2004.

During the following months, the defendant documented, via written warnings, a variety of performance deficiencies on the part of the plaintiff.  On June 11, 2004, the plaintiff was issued a written warning for calling in after his scheduled start time and, after calling to indicate that he would be at work later, not showing up for work at all.  On July 23, 2004, the plaintiff was issued a written warning for wearing jewelry on the outside of his uniform.  On July 26, 2004, the plaintiff was issued a written warning and suspension for making an alleged racial remark about his co-workers over the walkie-talkie systems.  The alleged racial remark was "foreigners" or "foreign guys."  The plaintiff was originally suspended for three days for the remark.  According to the defendant, the suspension was later reduced to one day.

The defendant has produced an unsigned written warning and one-day suspension from September 3, 2004, which it alleges was issued to the plaintiff for yelling at Mr. Strobel when he threatened to issue a different warning to the plaintiff for pushing wheelchairs prior to his start-time.  The plaintiff denies receiving this written warning and also denies that the underlying event ever took place.  On September 29, 2004, the plaintiff was issued a warning for using his cell phone while pushing a passenger in a wheelchair and for failing to fasten the seatbelt of the wheelchair passenger.  The plaintiff denies having used his cell phone while pushing a passenger.  He also contends that he was singled out for punishment in this instance, because many other employees use their cell phones during work.

There is a factual issue regarding seatbelts.  The plaintiff admits that Mr. Strobel, his

3

supervisor, had instructed him specifically to fasten the seatbelts for the customers. However, the plaintiff contends that his own preferred practice of asking each customer if he or she wanted to wear the seatbelt, and leaving it at that, was in closer accordance with the company's written policy, which is set forth in the employee manual. The manual does state that "Prospect employees are expected to encourage the use of seatbelts for the passenger's safety, but use of the belts by the passenger is voluntary." (Docket No. 42 at p. 10) However, the manual goes on to direct the employees, more specifically, "After assisting a passenger into a wheelchair, explain the usage of the seatbelt is for their added safety and proceed with fastening the belt." (*Id*. at p. 11) Moreover, the plaintiff admitted at his deposition that he knew it was the defendant's policy to require seatbelts, (Docket No. 32, Ex. 2 at p. 167 ) ("Yeah, I knew seatbelts [were] mandatory under [the] policy."), and the defendant has produced three re-training memoranda signed by the plaintiff stating, in capital letters, "Any employee failing to properly use seatbelts on aisle chairs or wheelchairs will be subject to termination." (Docket No. 32, Ex. at p. 23-27)

On October 21, 2004, a female coworker filed a harassment claim against the plaintiff for stating, in her presence, that he had "only had one other white woman." Ronald Claypool, the Human Resources Manager, investigated the complaint. On October 26, 2004, Mr. Claypool telephoned Mr. Evans in order to obtain a statement. Mr. Evans alleges that, during this conversation, he told Mr. Claypool that he had never said anything regarding being with white women. Mr. Claypool alleges that Mr. Evans refused to speak about the matter. The conversation ended when Mr. Evans hung up the phone on Mr. Claypool. On October 29, 2004, Mr. Claypool issued a memorandum to the plaintiff stating that no clear determination had been made on the sexual harassment complaint, but reminding him that offensive comments were

4

prohibited by the company.

On November 1, 2004, Mr. Evans filed his second EEOC complaint, alleging that he was being retaliated against for filing his first complaint by way of the numerous suspensions and written warnings listed above. Meanwhile, the plaintiff continued to be written up for various infractions. On November 4, 2004, the plaintiff received a written warning for wearing excessive jewelry at work; specifically, he was wearing too many rings. On December 21, 2005, Mr. Evans was issued a written warning and was suspended for five days for pushing a passenger in a wheelchair on a moving walkway. The plaintiff alleges that he did not know this was a violation of company policy. On the very same day, the plaintiff filed his third EEOC complaint, alleging race discrimination and retaliation. The plaintiff filed this complaint because he thought his punishment for pushing a passenger in a wheelchair on the moving walkway was discriminatory.

On April 27, 2005, Mr. Evans was issued another written warning for failing to meet an inbound passenger at the gate, as a supervisor had instructed him to do. Mr. Evans has admitted that he did in fact fail to follow his supervisor's instructions in this instance. On May 2, 2005, based on this event, Mr. Evans was suspended for insubordination.

On November 2, 2005, the events unfolded that would lead to the plaintiff's termination. On that day, Mr. Claypool, the Human Resources Manager, happened to be in the Nashville Airport conducting a routine visit, when he observed Mr. Evans pushing a passenger in a Southwest Airlines wheelchair, which is, according to the defendant, against company policy. The Southwest chairs are narrow and do not contain seatbelts. The plaintiff alleges that the passenger in question was already seated in the Southwest chair when he found her and that he

5

asked if she would rather move to another chair, and she declined.  In addition, he denies the existence of the policy[2], although he does admit that his supervisors had instructed him, specifically, that all customers should wear seatbelts.  Mr. Claypool approached the plaintiff and asked him why the woman was in a Southwest wheelchair.  According to the plaintiff, he attempted to answer Mr. Claypool, but Mr. Claypool did not give him a chance.  However, at his deposition, the plaintiff testified that he took this opportunity to complain to Mr. Claypool about wheelchair assignments, and Mr. Claypool told the plaintiff that he should direct that complaint to Mr. Strobel, his direct supervisor.  In any event, Mr. Claypool noticed that the plaintiff had left the customer at issue unattended and, upon further investigation, saw that the wheelchair's brakes were improperly locked, and as a result, the plaintiff was suspended from work.  On November 9, 2005, the plaintiff was terminated on the basis of his recent performance issues.

Mr. Evans filed this action on May 9, 2005, before his termination.  (Docket No. 1)  On December 1, 2005 Mr. Evans filed an Amended Complaint, alleging (1) unlawful discrimination in violation of Title VII, (2) unlawful discrimination in violation of 42 U.S.C. § 1981 and (3) unlawful retaliation in violation of Title VII.  (Docket No. 16)  On August 21, 2006, the defendant moved for summary judgment. (Docket No. 32)

## ANALYSIS

**I.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted

---

[2]At his deposition, however, the plaintiff admitted that it was against company policy to use a Southwest wheelchair without a seatbelt, stating, "Yeah, I did it anyway.  Yeah, I did." Further, as mentioned above, the defendant has produced three memoranda signed by the plaintiff indicating that he did know about the seatbelt requirement.

6

if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir.

2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II. Unlawful Retaliation In Violation Of Title VII

The plaintiff asserts that he was retaliated against in violation of Title VII for reporting acts of racial harassment to the EEOC. Title VII cases follow the burden-shifting structure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). After the plaintiff demonstrates a *prima facie* case, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse employment action. *Id*. If the defendant is able to make that showing, the burden shifts back to the plaintiff to demonstrate that the reason offered by the defendant was not its true motivation, but rather, a pretext for discrimination. *Id*.; *see also Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004); *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997). Because the plaintiff does not set forth an adequate *prima facie* case, the remaining stages of the analysis are unnecessary.

To establish a *prima facie* case for a retaliation claim, the plaintiff must show the following: (1) that he engaged in activity protected by Title VII, (2) that the defendants knew he engaged in protected activity, (3) that he suffered an adverse employment decision, and (4) that a causal connection exists between the protected activity and the adverse action taken against the

8

plaintiff.  *Siegfield*, 389 F.3d at 565, *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987).  Alternatively, Mr. Evans can establish a *prima facie* case by proving that he was "subjected to severe or pervasive retaliatory harassment by a supervisor" and that there was a causal connection between the protected activity and the harassment.  *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).  The parties do not dispute that the plaintiff engaged in protected activity, that the defendants knew about the activity, or that the plaintiff suffered an adverse employment decision.  However, because the plaintiff has failed to proffer sufficient evidence in favor of causation, his *prima facie* case must fail.

In order to demonstrate causation, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not engaged in the protected activity.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  Some Sixth Circuit opinions have indicated that close temporal proximity between the two events is sufficient to demonstrate a causal connection for purposes of the *prima facie* case.  *See, e.g., DiCarlo v. Potter*, 358 F.3d 408, 421-22 (6th Cir. 2004); *Siegfield*, 389 F.3d at 563.  However, in each of those cases, the adverse employment action occurred only several months after the plaintiff undertook a protected activity.  The Sixth Circuit has adhered to the rule that an interval of more than six months between the adverse action and the protected activity will not, by itself, establish a causal connection.  *Lentz v. City of Cleveland*, 410 F. Supp. 2d 673, 691 (N.D. Ohio 2006) ("anything over six months is generally insufficient, standing alone, to establish a causal connection") (citing *Sanchez v. Caldera*, 36 Fed. Appx. 848, 846 (6th Cir. 2002).  Mr. Evans' final EEOC complaint was filed nearly eleven months before he was terminated.  Therefore he cannot demonstrate causation solely through temporal proximity.

9

Neither can Mr. Evans demonstrate a causal connection in any other way. Although the burden to establish a *prima facie* case is "not onerous," Mr. Evans is required "to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal citations omitted); *see also Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987) (holding that the plaintiff's own assertions, by themselves, were insufficient to demonstrate a causal connection).

Mr. Evans cites his negative performance citations and suspensions as circumstantial evidence tending to show a causal connection between his EEOC filings and his eventual termination. The court does not view the citations and suspensions in that light. The record shows that Mr. Evans received his first two citations before he ever filed an EEOC charge, and, although the plaintiff does not recall having received it, the defendant has proffered another citation dating all the way back to 2002. Further, the plaintiff has admitted to committing the underlying offense for the great majority of citations he has received. With regard to the seatbelt infractions, the plaintiff has challenged the validity of the seatbelt policy, but the record shows, and the plaintiff admitted at his deposition, that he was well aware of the policy and that his superiors expected him to adhere to it. The court does not find that negative citations and suspensions, where the plaintiff has admitted, in most cases, that he committed the underlying infractions, are evidence in support of a causal connection between his EEOC complaints and his termination. To the contrary, if the plaintiff had been able to demonstrate a *prima facie* case, those citations and suspensions would have provided strong evidence in favor of a legitimate,

10

non-discriminatory reason for the plaintiff's termination. However, because the plaintiff has not provided any evidence of causation, the court need not perform that analysis.

## III. Race Discrimination Under Title VII

The plaintiff alleges that the defendant impermissibly discriminated against him on the basis of race, in violation of Title VII, both by maintaining a hostile work environment and by terminating him on the basis of race. Because the plaintiff has failed to make a sufficient factual showing on both bases for relief, the plaintiff's Title VII claims must both be dismissed.

### A. Hostile Work Environment

The plaintiff alleges that the defendant impermissibly discriminated against him on the basis of race, in violation of Title VII, through maintaining a hostile work environment. The Supreme Court has observed that a supervisor impermissibly discriminates on the basis of a protected characteristic when he harasses a subordinate because of that characteristic. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986). However, the harassment need not lead to an economic or tangible effect on the employee; rather, when "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment,'" it is actionable harassment under Title VII. *Id.* at 66 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)); *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).

In order to establish a hostile work environment in violation of Title VII, a plaintiff must prove that (1) he was a member of a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on the employee's protected status, such as his race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant

11

knew or should have known about the harassing conduct but failed to take reasonable care in preventing or correcting the harassing behavior. *See Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 604–05 (6th Cir. 2002); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir. 1999).

The Sixth Circuit has cautioned courts not to disaggregate incidents of alleged hostility in evaluating a hostile work environment claim, for fear of diluting the significance of the incidents. *See Williams*, 187 F.3d at 563; *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999); *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 765 (6th Cir. 2000) (Martin, J., dissenting). Rather, courts should review the work environment as a whole and analyze the cumulative effect of the incidents, each of which might not independently cross the "Title VII threshold." *Williams*, 187 F.3d at 564. The Court also has recognized that evidence of racial harassment, especially racial comments and slurs, need not be directed specifically at the plaintiff in order to contribute to a work environment that is hostile to him. *Farmer*, 295 F.3d at 605; *Jackson*, 191 F.3d at 660, 661. Therefore, when a plaintiff learns second-hand that a derogatory comment was used, such evidence can contribute to a hostile work environment. *Jackson*, 191 F.3d at 661. In addition, an action towards a plaintiff not specifically racial in nature can constitute proof of a hostile work environment if "it would not have occurred but for the fact that the plaintiff was African-American." *Jackson*, 191 F.3d at 662; *see also Williams*, 187 F.3d at 565 (stating that non-sexual conduct can contribute to a sex-based hostile work environment if it would not have occurred but for the fact of the plaintiff's sex).

### 1.     Affecting A Term, Condition, Or Privilege Of Employment

The plaintiff has utterly failed to show that the alleged harassment affected a term,

condition, or privilege of his employment**.**  In order for harassment to satisfy that standard, the plaintiff must show that "it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and creates an abusive working environment."  *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir. 1999).  In performing this analysis, the Supreme Court has directed lower courts to consider "all of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance."  *Harris*, 510 U.S. at 23; *see also Faragher*, 524 U.S. at 787–88.  The issue is not "whether each incident of harassment standing alone is sufficient to sustain the cause of action . . . but whether—taken together—the reported incidents make out such a case."  *Williams v. General Motors Corp.*, 187 F.3d at 562.  However, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524 U.S. at 788 (citations omitted), *quoted in Hafford v. Seidner*, 183 F.3d 506, 512–13 (6th Cir. 1999).

This determination includes an objective and a subjective element.  First, objectively, the environment must be such that "a reasonable person would find [it] hostile or abusive."  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *see also Faragher*, 524 U.S. at 787; *Jackson v. Quanex Corp.*, 191 F.3d at 658.  Second, the plaintiff must "subjectively perceive the environment to be abusive."  *Harris*, 510 U.S. at 21; *see also Faragher*, 524 U.S. at 787; *Jackson*, 191 F.3d at 658.

The plaintiff has failed to show that, objectively, a reasonable person would find the work environment at Prospect to be abusive.  The plaintiff has identified several isolated incidents that he did not experience himself, involving offensive language.  Although offensive

13

conduct that a plaintiff is indirectly aware of can weigh in favor of a hostile work environment, *Jackson*, 191 F.3d at 661, the plaintiff has proffered no case law, and the court has found none, in which a hostile work environment claim was based solely on a few such incidents.

The alleged incidents in which the plaintiff was directly involved do little to bolster this element. Mr. Strobel's query as to whether the plaintiff would invite any white people to his wedding, though perhaps insensitive, does not amount to abuse. Otherwise, Mr. Strobel's statements to the plaintiff are consistent with that of any supervisor who is unhappy, understandably, with an employee's work performance. Taken together, the incidents the plaintiff did not himself experience, the wedding conversation, and the general allegations regarding treatment do not satisfy the objective element. The allegations do not "amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788. The plaintiff's cannot establish a Title VII claim on the basis of a hostile work environment.

### B. Adverse Employment Action

Additionally, the plaintiff asserts that his termination constituted race discrimination in violation of Title VII and 42 U.S.C. § 1981. Race discrimination cases under Title VII and 42 U.S.C. § 1981 each follow the same burden-shifting structure set forth above. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n. 2 (6th Cir. 2000).

Once again, the plaintiff fails to establish a *prima facie* case. To establish a *prima facie* case for a discriminatory employment action, the plaintiff must show the following: (1) that he belongs to a protected class, (2) that he performed his job satisfactorily, (3) that he suffered an adverse employment action, and (4) that a comparable non-protected person was treated better.

14

*McDonnell Douglas*, 411 U.S. at 802, *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582-83 (6th Cir. 1992). Because the plaintiff cannot show that a comparable, non-protected person was treated better than he was, the plaintiff's *prima facie* case fails.

A "comparable non-protected person" (also referred to as a "similarly situated non-protected employee," *Newman v. Federal Exp. Corp.*, 266 F.3d at 406), must be "nearly identical" to the plaintiff with regard to all relevant aspects of his or her employment situation. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). *See also Mitchell v. Toledo Hosp.*, 964 F. 2d 577, 582 (6th Cir. 1992) (holding that, in the disciplinary context, the colleague and the plaintiff "must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"). The plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated' . . . ; however, the plaintiff and the comparable [employee] must be similar in all *relevant* aspects." *Hoskins v. Oakland County Sheriff's Dept.*, 227 F.3d 719, 732 (6th Cir. 2000) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

Not only has the plaintiff failed to identify any "similarly situated" employees, he has failed to name any individual comparable white employees at all. Instead, the plaintiff merely asserts that "Strobel did not . . . question white employees about following similar company policies" and that the defendant "treated white employees more favorably than black employees." (Docket No. 37 at p. 16) That is simply insufficient. Without even seeking to name any specific white employees who are "similarly situated" to himself, the plaintiff cannot

15

hope to establish a Title VII claim on the basis of an adverse employment action.

## V. The Plaintiff's Motion to Strike

Finally, the court must address the plaintiff's Motion to Strike the affidavit of Robert Strobel and its attached exhibit. (Docket No. 44) In the affidavit, Mr. Strobel states that he used the term "black mammy" to describe a roofing material that he had used on his house, and that the term is not derogatory when used in reference to this roofing material. As an exhibit, the defendant has attached a print-out from a web page in which "black mammy" is used in a parenthetical for "below grade waterproofing." (Docket No. 41 at p. 2, 3)

The plaintiff alleges that both the affidavit and the attached exhibit are hearsay. Mr. Strobel's is not an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The affidavit is simply a vehicle for submission of the exhibit attached, the authenticity and genuineness of which the defendant does not challenge. The affidavit is not hearsay and will not be stricken.

An out of court statement offered to serve some purpose other than the truth of the matter asserted is not hearsay and may be considered by the trier of fact. *See Browne v. Signal Mountain Nursery*, L.P., 286 F. Supp. 2d 904, 924 (E.D. Tenn. 2003). The exhibit to the affidavit is not hearsay because it has not been offered to prove "the truth of the matter asserted" regarding the Sentry Chemical Company's product data, but merely provides an example of the term "black mammy" being used in the way that the plaintiff claims it can be used. The advisory committee notes to Rule 801 provide that, "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. . . . The effect is to exclude from hearsay the entire category of 'verbal

16

acts.'" Fed. R. Evid. 801 advisory committee's note. The defendant's exhibit functions precisely in this manner. It is being offered as one example of the use of a specific term—the significance lies in the fact that the term was used, and not in the truth of anything asserted regarding the effectiveness of the Sentry Chemical Company's products. On that basis, the exhibit is not hearsay and will not be stricken. *See, e.g.*, *Martin v. City of Indianapolis*, 192 F.3d 608, 613 (7th Cir. 1999) (holding that statements in a newspaper article offered to show that the declarants said them were not hearsay); *Southerland v. Sycamore* , 125 Fed. Appx. 14, 22 (6th Cir. 2004) (testimony "used to show that . . . officials had knowledge of the problem" was not hearsay); *U.S. v. Martin*, 897 F.2d 1368, 1371 (6th Cir. 1990) ("The hearsay rule does not apply to statements offered merely to show that they were made or had some effect on the hearer.")

Finally, the court notes that, although the defendant's exhibit and affidavit will not be stricken, this issue as it pertains to the motion for summary judgment is largely academic. There exists a real factual controversy not as to whether Mr. Strobel meant "roofing tar" when he said "black mammy," but whether he said "black like a nigger" instead of "black mammy." That controversy, for the purposes of this motion, has been decided in favor of the plaintiff. That is, the court has assumed at this stage that Mr. Strobel said "black like a nigger" instead of "black mammy." Therefore, although it will not strike Mr. Strobel's affidavit and the attached exhibit, neither has it relied on them in making the above determinations.

17

## CONCLUSION

For the reasons stated herein, the defendants' Motion for Summary Judgment will be granted, and the plaintiff's Motion to Strike will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

18